CADLEROCK PROPERTIES JOINT VENTURE, L.P.
*v.* COMMISSIONER OF ENVIRONMENTAL
PROTECTION
(AC 32864)

Beach, Alvord and Borden, Js.

Argued September 14—officially released November 15, 2011

*Michael G. Albano*, for the appellant (plaintiff).

*Sharon M. Seligman*, assistant attorney general, with whom were *David H. Wrinn*, assistant attorney general,

and, on the brief, *George Jepsen*, attorney general, and *Patricia A. Horgan* and *Kimberly P. Massicotte*, assistant attorneys general, for the appellee (defendant).

*Opinion*

BORDEN, J. The plaintiff, Cadlerock Properties Joint Venture, L.P., appeals from the judgment of the trial court, after a court trial, in favor of the defendant, the commissioner of environmental protection,[1] on the plaintiff's complaint, which was based on a claim of inverse condemnation. The plaintiff claims that, because certain portions of the plaintiff's property are not contaminated, the defendant's final administrative pollution abatement order with respect to the property constitutes an inverse condemnation of the property. We affirm the judgment of the trial court.

The court found the following facts.[2] The plaintiff acquired the property, which consists of 335 acres located in the towns of Willington and Ashford, in November, 1996, from an affiliated entity, Cadle Properties of Connecticut, Inc., which had, in turn, acquired the property via a deed in lieu of foreclosure from Ashford Development Company in connection with a loan owed to another affiliate company, namely, Cadle Company of Connecticut, Inc. On August 15, 1997, the defendant issued to the plaintiff the pollution abatement order involved in this case.

The order required the plaintiff to retain a qualified consultant to prepare certain documents and to implement or oversee actions required by the order. These actions consisted of the following: submission of a

---

[1] We refer herein to the commissioner as the defendant, and to the department of environmental protection as the department, depending on the appropriate context.

[2] The trial court made extensive factual findings, some of which are not relevant to the sole legal issue presented by this appeal. In the interest of brevity, we focus only on those factual findings that are relevant to that issue.

scope of study for the investigation of soil, groundwater and surface water pollution on or emanating from the site; investigation of the potential impact of the pollution on human health and environment, both on-site and off-site, including the existing and potential extent and degree of soil, groundwater and surface water pollution; investigation of the proposed location and depths of groundwater monitoring wells, and soil and surface water sampling and submission of a schedule for the investigation. In addition, the order required the plaintiff to remove solid waste from the site to a lawful solid waste facility, and to notify the defendant three days prior to that removal of the identity of that facility. Once the defendant had reviewed and approved the scope of study, the plaintiff was required to perform the investigation and other actions specified in the scope of study in accordance with the approved schedule, and to notify the defendant of the date and time of installation of the monitoring wells and of each soil and water sampling. Thirty days after completion of the investigation, the plaintiff was required to submit to the defendant for her review and approval a comprehensive, thorough report describing in detail the investigation performed, the existence and degree of potential and extent of soil, surface water and groundwater pollution on and emanating from the site. In addition, the report was to evaluate the alternatives for abating the pollution, describe the most expeditious schedule for each alternative, propose a preferred remedial alternative with supporting justification and offer a detailed program and schedule for performing that remedial alternative. Further, the report was to proffer a soil, surface water and groundwater monitoring program to determine the degree to which the approved remedial actions have been effective and a schedule for performing the groundwater monitoring program. Finally, the plaintiff was required to perform the approved remedial actions

according to the schedule approved by the defendant, to certify completion of the approved actions to the defendant and to undertake additional remedial actions if the approved actions did not result in the prevention of and abatement of soil, surface water and groundwater pollution.

The plaintiff administratively appealed the issuance of the order, and in October, 1998, an administrative hearing officer affirmed the order. Pursuant to General Statutes § 22a-434, on December 28, 1998, the defendant filed a certified copy of the order on the Ashford and Willington land records. The plaintiff thereupon appealed the order to the Superior Court, which dismissed the appeal in May, 1999. The plaintiff then appealed further, and in January, 2000, the Supreme Court affirmed the validity of the order. See *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection,* 253 Conn. 661, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

The order applies to the entire 335 acre site. The site is not officially subdivided on the land records. It is, however, divided into twelve lots on the Ashford assessor's map, namely, lots numbered 3, 6, 7, 8, 9, 10, 13, 14, 19 and 27 in Ashford, and lots numbered 11 and 11a in Willington.

Meanwhile, in December, 1998, the plaintiff retained HRP Associates, Inc. (HRP), as a qualified environmental consultant to prepare the documents and oversee the actions required by the order. In March, 1999, HRP submitted its scope of study to the defendant, which the defendant disapproved in July, 1999. HRP notified the defendant that it intended to conduct additional soil and groundwater analysis and to submit a revised scope of study, but no such revised scope of study was ever submitted to the defendant. At some point, Daniel

C. Cadle, acting for the plaintiff, wrote to the attorney general indicating that all problems had been identified and solved at the site. With respect to that letter, HRP wrote to Cadle that "HRP feels that it is our obligation to inform you of our concern that additional areas of contaminated soil may exist onsite [and that] it is HRP's belief that the contaminated soil that may exist onsite has not been adequately identified, evaluated, quantified, excavated or staged in piles. Additional sub-surface investigation is needed to evaluate the presence of contamination onsite." The plaintiff did not send this letter to the department. The department never received any Phase I, II or III investigation reports from HRP.

The department most recently inspected the site in August, 2007, March, 2008, and September and October, 2009. In the latter two months, the department visited approximately fifty locations on the site and identified numerous areas of environmental concern across the site.

There are twelve unsigned draft reports prepared by HRP, identified as "draft Phase I" reports, along with a summary chart describing "recognized environmental conditions" on twelve lots in Ashford and Willington. None of these reports was submitted to the department in response to the order in question. These reports indicate that only a Phase I environmental investigation was conducted, but not a Phase II or III.

At trial, the plaintiff maintained that "[b]y every indication, lots 11a, 14 and 27 are free from contamination, impose no risk to the population or the environment," and that the continued presence of the order on those lots prevented the plaintiff from using the site as it is entitled to do under the law. Consequently, the plaintiff maintained further, regarding those three lots, the order amounts to a "practical confiscation that can only be remedied by an order of th[e] [c]ourt requiring the

[department] to amend the Order so as to exclude lots 11a, 14 and 27." The trial court deemed it unnecessary to decide whether it should or could order the defendant to amend the order and exclude any lot proven to be uncontaminated because it found "insufficient proof that these three lots are uncontaminated." Accordingly, the trial court rejected that particular claim of the plaintiff.

The plaintiff's sole claim on appeal is that because lots 11A, 14 and 27 are not contaminated, the enforcement of the order with regard to those lots amounts to inverse condemnation and that the trial court improperly found to the contrary. We disagree.[3]

The trial court's finding that the plaintiff had not, as a factual matter, adduced sufficient proof that the three lots are uncontaminated must stand unless it is shown to be clearly erroneous. See *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 727, 941 A.2d 309 (2008). It is clear that there is ample evidence in the record supporting the court's finding.

The trial court specifically credited the defendant's principal witness on the subject of contamination, namely, William Warzecha, a hydrologist and supervising analyst of the department, who is an expert in the field of contamination and whose testimony was not rebutted. Warzecha testified that the three lots cannot be declared free of further investigation or contamination. He testified further that the area in question is a

---

[3] The defendant raises numerous arguments, both factual and legal, in response to the plaintiff's appeal. Among these are that (1) the trial court properly found that the plaintiff had failed to prove that lots 11A, 14 and 27 are free from contamination; (2) the trial court properly determined that the plaintiff had failed to establish the finality of its claimed deprivation of property; (3) the order constitutes a valid exercise of the police power; (4) the plaintiff failed to show loss of beneficial use of its property as a result of the order; and (5) the plaintiff's request for relief is improper in the context of an inverse condemnation claim. Because we agree with the defendant's first such argument, we need not address the others.

"highly suspect site" due to its history of dumping, that buried waste is not visible to the naked eye, and that lot 11A required a subservice investigation, including soil and groundwater sampling, due to its proximity to and use as access to lot 11, where wire was burned and rows of automobiles are buried. Warzecha also testified that, although he did not know of areas of environmental concern on lot number 27, there was a need for assurance that the lot was not polluted by installing groundwater monitoring wells. He further testified that, although lot number 14 was unlikely to contain areas of environmental concern that did not mean that groundwater on that lot was not impacted. The court also notes, as do we, that the plaintiff did not introduce any scientific testimony regarding the lack of pollution on any of the three lots in question and failed to provide evidence supporting a scientifically based determination that the remaining lots are free of soil, surface water or groundwater pollution.

The judgment is affirmed.

In this opinion the other judges concurred.